What we ask this court to do is to reverse the convictions which did not obtain an acquittal and either enter a judgment of acquittal on the two counts or a new trial. The historical facts here were that the $9.1 million were paid only after both the Navajo Housing Authority and the Fort Defiance Housing Corporation both had independent inspectors inspect the construction progress before payment was made. Each of the 13 reimbursements identified Bill Aubrey's company, Lodge Builder, as the payee, and the record sites for those are on page 2 of the reply brief. At that point, those monies ceased to belong to the Indian Tribal Organization, because at that point, those monies had been independently verified and inspected, and what the tribal entities had were some of the best homes built in the nation, as recognized by the HUD award to Bill Aubrey as the best and the best in the country. What's your best case on that proposition? First, if you look at the defense exhibits, the Fort Defiance Housing Corporation, the historical facts were more than $8 million. No, the case. What's your precedent? There really is no precedent under 1163, because this statute has never been applied. Well, how about an analogous case, then? What's the principle here? The principle is that the contract was for homes. Once the homes are inspected and shown, then the tribal organization has the benefit of its contractual bargain. Okay. But we're looking at a criminal statute, right? Correct. Yes. And we're looking at the language in the criminal statute. Yes. And it says that the monies have to belong to the Indian Tribal Organization. Right. Once the contract is met, inspected, before payment is made, those monies clearly were the Indian Tribal Organization's money. So we have this case in a different, for a different statute, Von Steven, I think it is, about how much supervision and control does the government have even after the money is paid. Yes. And it looks at various indicia of supervision and control, including auditing and follow-ups. Yes. Were there those sorts of indicia of control for the NHA and the FDHC? Absolutely, because the contract says, we're not going to give you a penny until you prove to us that the performance on the contract is done. So their inspectors go out, look to see, is 50 percent of the streets done? They eyeball it. They test it. They verify it. Does it meet all the requirements? Only after doing that do they give him one dime. And, of course, Mr. Robbery has paid for all of that at the front end. So this Von Steven case says even after payment is made, the money could still be deemed to be under the supervision and control and thus property of the government, because it has these follow-up reporting and inspection obligations. And are those indicia here as well? Are they the same? Does NHA have the same sort of oversight, reporting, et cetera? No, because what has happened is that what we're seeking here is the actual inspection. That is the trigger for the payment. But just a minute. In the requisition form itself for these funds, it says, I certify the data reported. The funds requested are correct. The amount requested is not in excess. In the event funds provided become more than necessary, such excess shall be promptly returned as directed by HUD. So it seems to me that even in the requisition form, your client would have the idea he's not in complete control, because they can come out and determine whether the funds have become more than necessary. I mean, that's right in the form. The problem with that form is it doesn't meet with the economic reality of this transaction. Well, just a minute. I'm not talking you can't talk about economic about this transaction. We're talking about belong to. Correct. And the definition of belong to. And when I go to Webster, it would be the property of a person or thing. And when I look at Vaughn Stevens, as my colleague has, it seemed to me that there was some exercise of supervision or control even after payment. So I looked all over in this record to try to determine if there was. And it seems to me that that requisition form is pretty straight. If you get more funds than necessary, you're going to have to give them back. And, therefore, they're not yours until we make sure they're not more than necessary. At the front end, Your Honor, to answer your question, there is a budget for $12.6 million. I know what the budget is. The funds that we're talking about were only $0.70 on a dollar. So there was no way that they were going to cover the entire project. There was $0.30 on a dollar that was never paid, Bill Aubrey. So he got these homes to 99 percent completed on his own money receiving only 69 percent of the funds. So I understand that. But what we're looking at is do the funds belong to whom? And in this, you may argue that in this particular situation you don't think there's ever any chance they could have belonged to the government. But there's no question, nonetheless, that the government has the right to go in and make sure that the funds provided are not more than necessary. And, Your Honor, in the record at 1965 to 1969 of the EORs, the NHA looked into it and determined that they owed Bill Aubrey $10.8 million, not $9.1 million, and then never paid him the $1.7 million. That is also in Defense Exhibit 516 and 516-1. So there was a determination made that NHA owed $10.8, which was originally what Bill Aubrey asked for. They slashed it down to $9.3. They only paid him $9.1. So that was after the fact. But just a minute. It seems to me that all you're arguing is what you can argue to the jury. What I'm doing is I'm trying to determine if, in fact, the jury instructions, given what we have here on a motion for acquittal, are correct, if, in fact, they still belong to the tribal organization, and if, in fact, the tribal organization has a right for a claim on them. You make your arguments you want to the jury. My decision is not on your argument to the jury. My decision is, do the funds still belong to the tribal organization? And if you can't make that argument, well, you lose. Going to the Court's question, at the preliminary instructions, going to the jury instruction issue on a new trial, the district court told the jury that the issue for them was whether the funds belonged to Fort Defiance Housing Corporation or NHA or Bill Aubrey and someone else. When I asked for that same instruction to the jury at the end, the district court refused to give that instruction, my theory of the defense on this part of the case. Then I was left with a jury that had been instructed that earlier, so the jury could convict Mr. Aubrey on monies owed to subcontractors, which was a flaw because the statute doesn't go there. And so that's a reason for a new trial. In addition, Your Honor, the forensic expert did far more than simply take voluminous documents and then summarize him. What that expert did was just lay off his table as court chair. Well, I mean, I want to go back to your instructions to the jury. I read your instruction to the jury, and I read your objection. It seems to me that the objection you made to the judge was not the same one you're making to me. You said to the judge, this instruction should have been split into three elements instead of two. And now to me, you're saying, no, this instruction doesn't cover the theory of the defense. I guess I'm trying to figure out if it's even the same instruction argument that you're making. Because, I mean, I was in trial a lot of times. I had to give instructions to the judge. I can't on appeal change my theory as to what instruction I wanted. I understand, Your Honor. At EOR 2473 to 2474, I bolded where I told the judge that not every conversion or misapplication is a crime under the statute. It has to be the money or funds belonging to the Indian tribal organization. The second took away my argument that Aubrey or the subcontractors had the money. That was in the initial instruction given to the jury at the start of the case to guide them. So I directed him right to the language that I had. Go ahead. Let me just to make sure I understand. Because my understanding was that the money that came from NHA was identified for a specific contract or receipt. Then the money went to FDHC, still identified for that specific contractor or receipt. And then Mr. Aubrey or his company was managing the funds for FDHC. And instead of taking that money and paying off the particular contractor or receipt, it was used for other purposes. That, I mean, in highly simplified form was the theory of the case. So what was wrong with that, that the money was specified just like you have a bookkeeper who instead of paying the money for what the intended purpose was, uses it for other purposes? Because the monies were based on a percentage of completion. But was it aimed at a specific contractor or receipt? No. No. It's a fixed amount. This was a fixed price contract. So it wasn't aimed. It was just said the whole project costs $1 million and we'll give you progress payments. Yes. And so in the front end, Bill Aubrey is paying payroll every week. And the records show that he's paid $1.6 million. So before he even gets a dime for that work, he's already paid that money. He paid out over $8 million in the Fort Defiance development account. He's paying out that money before progress is completed. So these are reimbursements and the government's earmark is incorrect because it's impossible for those workers to wait until their progress payment comes in because by law they have to be paid weekly. So Bill has $1 million out in payroll. Once the inspectors come out and say, yeah, that labor's good, if the labor doesn't meet the standards, he gets no money back. That's the false premise of the argument that the government has, that these are earmarks. It's not like I hire an expert and the expert does the job and then I take those funds and hand to that expert. This is all performance-based drawdowns on performance-based progress. If a subcontractor comes in and does 85 homes like the Stucco and then for three months continues to incur expenses on their contract and no progress is made, Bill doesn't get a dime against that, what happened here. I would like to reserve two minutes. It looks like we're at 2.30, 2.31. If anyone has a question, I'll just reserve the remainder of the time. Very well, counsel. You may reserve your remainder. We'll hear from the government. Good morning, Your Honor. Scott Meisler on behalf of the United States. I'll start with the sufficiency arguments that Mr. Kennedy presented today. Well, let me ask you, what is the government's position as to when these funds stop belonging to the Indian interests? I'm going to answer the question a different way if I can, Your Honor, because I think Well, why don't you answer the question the way I asked it, because the issue is belonging to. I don't think that's the issue and that's why I want to direct the Court back to the statutory language. Well, it's my issue at the moment, counsel. Okay. Answer my question, then you can answer yours. I think in a case like this, I would go back to Judge Ikuta's point that the best analogy would be to the Section 641 cases. This Court has a decision in the Chilkat Nation case that explains that this statute is modeled after Section 641. Okay. But I'm asking the question, at what point do these funds stop belonging to the tribal organization? It's hard for me to answer that question, Judge, because I think this case Answer  primarily that the second half of the statute says belonging to or entrusted to the custody or care of an agent of an Indian tribal organization. And the jury instruction that Mr. Kennedy proposed omitted that phrase entirely, and it's an important phrase. It expands the reach of the statute beyond property law concepts of belonging to and pertinence and things like that, and reaches custody. And so even if in a strict property law sense the money didn't belong to, wasn't in the hands of NHA at some point in this chain of movement, it certainly was in the hands of FDHC. And to correct something that Mr. Kennedy or to expand on something Mr. Kennedy said, while Lodge Builder was identified as the payee in some of these documents and some of the requisition forms, the form that the NHA signed, the cover form, said vendor, payee, Fort Defiance Housing Corporation. The checks were written from NHA cut to Fort Defiance Housing Corporation. That was the subgrantee. Money went from HUD to NHA to Fort Defiance. Fort Defiance paid Mr. Aubrey in two ways. First, they just handed him the check. They said deposit in your account. Go ahead. You pay these guys. Then HUD's Office of Southwestern Programs raised some concerns about that and said we're worried about this. And Fort Defiance said, well, okay, we're going to actually open our own account at Wells Fargo, deposit the money there, and then we'll give it to Bill Aubrey just to add an extra layer here. And our theory was that Bill Aubrey was really controlling Fort Defiance. They had handed him, via this contract, Government Exhibit 13, it's in the SCR, they had handed him control of the money. Okay. So going back to my original question, when does do the funds stop either belonging to the tribal organization or remain in the custody of? Right. I think in this factual scenario, they were certainly in the custody or care of the tribal organization when they went into Bill Aubrey's personal account, all the way down to the end of the chain. So is that the moment of conversion? So FDHC has the Fort Defiance has the money, and you're saying that they're an agent of an Indian tribal organization? Yes. NHA. So it has the money. Then the money goes to Aubrey's account. So is that the moment of conversion, or does FDHC still have an ownership interest or that's still part of its care obligation when the money is in Aubrey's account? I think that he said that Aubrey is standing in the shoes of FDHC, and that was the language one of the NHA officials testified to at trial. Okay. Why don't we talk about the language of the statute? This is a criminal statute. It is, Your Honor. Mr. Aubrey is entitled to the rule of lenity. And so far, I'm not very encouraged by what you're telling us. Well, I think there's kind of two answers to it, right? One is along the lines of what Judge Acuto was asking earlier. The court in the case, the courts in the cases that construe statute, the statute on which Section 1163 was modeled, as well as Section 657, which is a banking statute that has similar language in it, have not gotten caught up in the niceties of exactly when the money changes hands from one to the other. Because you can always structure financial transactions in ways that obscure the source and origin of the funds. And so that's why I think the supervision and control cases provide a good analogy. And you asked earlier, I think one of the panelists asked earlier, was there supervision and control here? Judge Smith is certainly right to look to those forms. We pointed back to the subgrant contracts that Fort Defiance signed with NHA, under which they agreed to all kinds of auditing and regulation authority. They agreed to abide by all the hard regulations. And that's exactly the kind of stuff in Von Stevens, in Gibbs, in Johnson. But by analogy to Von Stevens, to get back to Judge O'Scallion's question, by analogy, the NHA is like the government in the Von Stevens statute. That's right. So if your theory is that NHA continued to own that money, then I get back to Judge O'Scallion's question, at what point did the NHA cease to own that money? Right. And that's a difficult question. I think certainly, I would give the same answer I gave before. It certainly goes into Bill Aubrey's account. And then we're talking about when the conversion, the misapplication happens. The jury can infer at that point, and again, we are on sufficiency review here, drawing all inferences in favor of the verdict. The jury can infer at that point that Bill Aubrey intends to put that money to an unauthorized use, that's misapplication, or to put it to his own benefit, that's conversion, instead of paying it to the contractor. Okay. So your theory is that when Mr. Aubrey puts the money into his account or is given it by FDHC to put in his account, that at that point there was conversion. That's the Conversion Act. Yes. I think that's right. And again, the evidence on that, as far as count 4 goes, is, again, the jury saw kind of a pattern of conduct here. They saw a pattern of depositing the money and then personal expenses, including gambling expenses being paid shortly thereafter. Let me ask, go back to the question I asked your opposing counsel, which is opposing counsel's theory is that Mr. Aubrey was like a general contractor. He was given the task of doing the whole project and was entitled to progress payments, and so these payments to him were by way of progress payments which he could use as necessary to keep the project going. The government's theory is that, no, each element of money going out was for a specific contractor or receipt. Yes. I think — right. I think I would refer the Court to the citations to the record that we have at page 20 of our brief, which are from NHA Grants Manager Shepard, Jennifer Bullock, who's the HUD's Office of Native Programs Director, and Leon Porter, who is the COO of NHA. And those witnesses all testified. In fact, Ms. Bullock gave the example of a roofer, and this is her testimony. She said, if a roofer's bill is what generates the requisition to NHA, on behalf of FDHC, and we pay the money out, the money has to go to pay the roofer. That was her testimony. And that sufficiency review, that I think is sufficient to support the jury's verdict, combined with the other NHA folks who testified to the same effect, that Mr. Aubrey couldn't just take the money and reallocate it as he saw fit. In other words, it should have been paid to the roofer directly from the Fort Defiance account? Is that what you're saying? Well, again, I'm not sure NHA officials testified that this, that paying the money out to a development consultant, because Aubrey was, again, Aubrey was not a contractor. He was not a general contractor. That was a highly contested issue at trial. But the evidence and Government Exhibit 13 show he was a development and consultant person for the tribe, not a general contractor. But even if he were, the testimony was. The money had to flow to him to pay the contractors. Under this arrangement, it did. I don't think, and I don't think necessarily it has to in every single case. I mean, I think it would be certainly fine. You're talking about this case? Yes. And certainly in this case, the way it worked was it went from NHA to FDHC to Aubrey. Okay. Suppose then that Mr. Aubrey, instead of paying it to his own account, thereby to pay the subcontractors, the funds went directly from the Fort Defiance account to the contractor. Is that what the Government expected to have happened here? I'm not sure we had expectations in this case. I'm not saying that the arrangement as a whole was prohibited. I'm trying to make some sense out of the language of the statute, which apparently you've told Judge Acuda that the conversion occurred when the funds were taken from Fort Defiance and put into his personal account. I don't buy that. And not used for the required purpose. Well, it passed through the account and went on to the required purpose, did it not? In many cases it did. But when it didn't, that would be a misapplication. Okay. So if there's funds, as I understood the Government's argument, if there's funds that were requisitioned for the roofer, or I think the electricians was the one at trial, went from HUD to NHA, so NHA had the money under the statute, then to FDHC, which was the agent of NHA, then to Mr. Aubrey's account, and then instead of paying the roofer or the electrician, he used it for some other purpose? Yes. And so was he obliged under the regulatory or legal structure to use that money for the roofer? Yes. That was the testimony at trial. There was no information, to my knowledge, with the regulation. Mr. Aubrey has cited an appeal regulations. I don't think those regulations are actually relevant to the case at all. They certainly don't say. Was there any subcontractor who never got paid? Yes. Four States Electric was the clearest example. That was the basis for Count 4 and 5, and certainly the clearest evidence was on Count 4. Four States submitted requisitions, submitted bills to Mr. Aubrey. Money was requisitioned in draws, I believe it was 11 and 12. 12 was the basis for Count 4. And Four States was never paid until bankruptcy proceedings many years later. And Mr. Kennedy, to his credit, conceded in the Rule 29 arguments before the district court at the sentencing hearing that Four States wasn't paid and was never paid and had done work and had submitted bills. And so that, and the government said in rebuttal argument to the jury, that alone proves the case of misapplication, and the district judge found that as well, that putting aside the very difficult, perhaps difficult questions about conversion and exactly when things happen, the definition of misapplication is intentionally putting money to an unauthorized or unjustifiable use, knowing that that act is wrongful. And that's, and that district judge affirmed, sustained the jury verdict. At least, he said, on that basis. So you're really not saying the conversion happened when it went to Mr. Aubrey's account, just when Mr. Aubrey didn't pay the right people, is that it? That would certainly sustain the misapplication theory, right? The conversion, I think, would require using it for his own benefit or to deprive the rightful owner of the money of the benefit of the funds. The judge's basis for sustaining the verdict, which I think is fully supported by the record, is that the verdict stands at least on misapplication grounds because Mr. Aubrey did not put the money to its required purpose. And the evidence about what the required purpose was is the citations I've given the Court in on page 20 of our brief. It was all the testimony from the NHA officials that this money did have to flow in the manner we described. Mr. Aubrey disputes that. Well, let's take the example of paying the payroll. Your position is that the government still, or at least the tribal organization still, that the funds still belonged to the tribal organization up to the time it was actually paid to the employees, to the workers? Or did the workers still take it subject to that belong? I'm not sure I understand the question, Your Honor. I thought Mr. Aubrey's position was that because he fronted the payroll money, that he could then reimburse himself for those costs when the money came in because it was an after-the-fact payment. That's what I thought his argument was. I'm asking what's the – we're still dealing with the language of the statute, which has to do with belonging to, or as you say, the trust aspect, on the belonging  to, if he prepays the payroll and draws down the money, which you say belongs to the tribal organization and apparently continues to belong to the tribal organization until when? Until the employee receives his check? Until the employee spends the money? Or when? When does that happen? Right. I understand your question. So you're asking about when Mr. Aubrey actually pays payroll to the employee. Is that tribal money? And is that when he goes to buy a Coke at the 7-Eleven, is that still tribal money? Is that what you're getting at? I'm just trying to figure out what point in time you're identifying as problematic. But my understanding is that, again, I think the belonging to point is an important one, but it's not essential to our case here. And so I don't want to – I'm not trying to avoid the Court's question, but I think in this case, when we're talking about money that travels down this path, we're really talking about funds that have been entrusted to Fort Defiance or Aubrey as – to carry out a certain function, which is to pay the money to the people whose work justified the money in the first place. Andrew, go ahead. I guess the problem I'm having is, as I understand it, the requisition was prepared, FDHC got the money, gave it to Lodge Builder, and Lodge Builder put it in a personal account. And as I understand it, you're suggesting that's still the tribal money when it's in the personal account. And then he used the money in that account for his own personal expenses and for invoices. He also transferred the money to another account, which he then paid his own personal expenses in. When did the conversion happen? Well, again, I'm – I think, Your Honor, we're talking about misapplication as well, not just conversion. Well, I understand what you said about misapplication. Right. I'm trying to understand conversion, because there's no question that that money went into two accounts of Aubrey's. The first one was a personal account, but then he transferred it out of that personal account and paid other personal. Is the second transfer to the personal account the conversion? I don't think it depends, Your Honor, on the niceties of how that works. In some of these instances, I can just tell you, some of these instances were he may have paid an expense out of one account, and the way the banking operations seem to work, as I understand the record, the bank automatically swept money from his joint account into that one. And so I don't think the statute works in a way that the conversion has to take place at a certain moment, whether it's the payment of the expense or the moment the bank sweeps the money in. And just to get back to kind of the core of this case, you can run into problems, I acknowledge, under the statute, because money is fungible. You can run into problems in a scenario where someone truly has fronted all of the money, and they really are just reimbursing themselves. And I would acknowledge that that happened here in many situations. But it didn't happen here for the specific counts in the indictment. Two counts, two draws, especially count four, which is the clearest, where Mr. Aubrey conceded he did not front money. It's clear from Jack Harris's testimony, from Dale Roten's testimony in the record, cited in the briefs, Mr. Aubrey did not front the money. So if the statute is problematic as applied to situations where someone, a contractor, truly fronts the money and is taking a reimbursement, it's not problematic on the facts of this case where he admittedly did not front the money where it mattered in these counts. Thank you, counsel. Your time has expired. Mr. Kennedy, you have some reserve time. Count five. Documents show Bill Aubrey paid over $129,000 in payroll during that period. Count five showed an $84,000 check that he paid before he got any reimbursement. For the over $280,000 that he spent, he got a $133,000 reimbursement. I say at that point, after you've paid more than $100,000 and your reimbursement is $100,000 less, that money becomes yours. Is $33,000 less? $100,000 less. $133,000 versus $130,000 in payroll plus an $84,000 check. For count four, I showed that he paid over $600,000 out, and he exceeded the amount that he was reimbursed by $200,000. At that point, the monies were his. Now, the government makes the absurd argument that somehow the tribal organization gets 90 of the best homes, a fixed asset worth millions of dollars, but at no point does Bill Aubrey get any money back for the work. Essentially, the government's argument is Bill Aubrey would work for free. The government is incorrect that the electrician did not get paid. He did get paid. He got paid out of the million dollars that Bill Aubrey didn't get, that he was contractually obligated in the leverage funding. And that is why NHA sought zero restitution in this case. That's why in 16 months the district court judge has not ruled on restitution. And there is no restitution. And NHA, in its own determination, said when it looked at Bill Aubrey's documents, we paid you $9.1 million. We should have paid you $10.8 million. And when I asked their CFO on cross-examination, I said, that 10.8 would have paid every subcontractor if you just paid what you determined that you obligated to pay Bill Aubrey. And she said yes. That's at 1962 to 1969. That's why. Where in the record is it established that four states electric was paid? In the foot ñ there are two footnotes in the document at the restitution hearing. Let me see if I can find it real quickly. Well, you can submit it later if you want. Let's see. Because your time is gone. I apologize. I'll give him a little more time. There's a footnote that lays that out. Footnote in some document in the record? In the brief that ñ Oh, in the brief. In the brief I put forward, the funds that paid that were ñ there was a million dollars that eventually came in to what Bill Aubrey had as a general contractor. That money and the remainder was paid by Mr. Aubrey because he never got the second part of the leverage funding. So those people are all whole. Those amounts were paid. When Fort Defiance sought protection of bankruptcy ñ Okay. But is it in this record in this case that four states electric actually got paid? Yes. It was established at the restitution hearing. Okay. And it's in the ñ Counsel, you're ñ I apologize. At page 11 of the opening brief, footnote 7, it cites to the record as to the monies that were used to pay that, and then in the restitution hearing it was set forth. But we don't have an order from the district court, Judge. Very well. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Ikuta, N.R. Smith